One case today, Kim v. Hanlon. I'll go ahead and call that and ask counsel Paul at the Camden County Democratic Committee to come forward. Good morning your honors. May it please the court. My name is William Tambucci. I'm from the Even if one disagrees with the concept of bracketing, it is not a constitutional violation that there's no constitutional right to ballot placement. There is however a constitutional right to association. There is indeed and that's what they're arguing about because there's a right not to be associated with people you don't want to be associated with. So let's let's dive in. We've got a lot of questions and we'll probably end up giving you more time than we're going to give you, so don't worry too much about the clock. But I want to start by asking you if you agree that our review here on a preliminary injunction is tripartite. We've got to review the findings, the fact that the district court made on a clearly erroneous standard findings or conclusions of law at de novo and then the overall decision to grant the discretion. That's that's pretty well settled right? No district your honor. Okay then let's talk about the facts here because there were a lot of factual conclusions that were reached by the district court and some of those are are relatively dramatic. One of the amici, the law school of clinic folks, summarized them up saying things like, and they're citing to the expert reports, they note things like the difference between being on and off the county line for congressional candidates ranged from 13 to 79 percentage points, a median of 36 percentage points, the loss rate for incumbents running off the county line, that's incumbents running off the county line over the period 2002 to 2022 was 52.6 percent, nearly 38 times higher than the loss rate for incumbents running on the line, that congressional candidates on the county line in the seventh and eighth districts in New Jersey more than doubled their vote share compared to others. So if we're looking, if we're just looking at the facts and the district court read these facts and said yeah there's there is a skew to this which goes beyond, I mean there's something going on here that's more than like it, wherever you are in the ballot doesn't make a difference. There's a real thumb on the scale that's being put down here. Why is that a clearly erroneous finding? Clearly erroneous in the context in which you arose. What? It's clearly erroneous in the context in which it arose, that those facts were presented at a preliminary injunction hearing without the opportunity to rebut those facts through full discovery and the like. Now the issue... So hold on just a second. I want to make sure I understand the implication. So what you're saying is it was clearly erroneous for the judge to hear the testimony, weigh credibility, I mean these people were put on the stand and they were cross-examined, right? Not all of them, your honor, not at all. In fact, judge, the cross-examination was limited. Limited in time in the sense that you didn't have all day, but are you are you telling me oh it would have been different if we'd had another hour with Dr. Pauschak. Is that is that what you're saying? It would have been different, in fact, judge, if we had had another day with Dr. Pauschak, which is not that great of a time frame in the context of this case. Dr. Pauschak... You're the ones that were saying at that time you were saying we've got a Purcell argument. This can't possibly be done. We have to move move move and now what you're telling this court is the court should, the district court really should have taken more time. What we're saying, judge, and I want to keep in mind I represent the Camden County Democrat Committee. I understand. As opposed to the clerks. But you joined the Purcell argument. I did join the Purcell arguments. The committee did join the Purcell arguments, but in the context of what was at issue here, giving 24 more hours wasn't going to make a difference. And what in the context of what was given here and what at stake here, the fact that these experts that were proffered by the plaintiffs or the candidates were such that they submitted studies that eliminated every other variable but for... The district court looked at your I don't... I not only saw them testify, but the attacks on them I don't think have merit. The fact, the attacks that suggest that this is factually erroneous information don't persuade me. Now persuade us that that decision was clear error. Not just wrong, but clearly wrong. It's clearly wrong because the party should have the opportunity to fully explore. You had a month. You had like, wasn't this thing filed in February? Wait. It was filed in February, right? The case was filed in February. Yeah. Sometime in the middle of February. And the hearing was held... Am I right that it was sometime in the middle of March? It was in March. Okay. So you had a month. Why do you say you had four days? I wasn't permitted to intervene in the case until four days before the hearing. Well, even if you didn't get the intervention order, are you telling me your client didn't... all the red flags weren't immediately at the top of the flagpole when this thing got filed? Our client was aware of it, Judge, and that's why we joined... It was served on your client, right? It was served on our client. We were not given the opportunity, the full opportunity, to address the court with regard to these experts. You're making an unfairness argument, so I'm going to press you on it. You were served with the complaint in the middle of February. We were, Your Honor. Okay. What you're suggesting to us is you didn't think to prepare until you got the intervention order. There was no thought about, hey, there's going to be fact-finding here. We better get witnesses. We better get this. There was absolutely thought about addressing it. The procedure that we followed was in accordance with what Judge Karashi ordered the Canada County Democrat to do. He told you don't get experts? No, no. He told me you can't participate, you're not going to be allowed to intervene without a motion to intervene, and he didn't grant the motion to intervene until four days before the hearing. Okay. Now, what we did... So your argument is we couldn't have prepared because he told us we weren't going to be allowed to intervene? That's not my argument, Judge. What my argument is is that the motions for the inlimitary motions, the Daubert motions that were filed, were not given due consideration in the course of the proceeding below. How so? We did not get the opportunity to address, argue those motions and present those to the court. You argued it in the context of the PI hearing, didn't you? It was argued by the clerks in the context of the PI hearing by the submission of the inlimitary motions on the day of the hearing. And you, and I might have misunderstood, but I thought we got a letter from you that said, in essence, colloquially, everything they said, we say, like with respect to the state. You adopted their arguments, right? We did. Okay. So, particularly in the context of a case where the parties are telling the court, including you, you know what I mean, including you, that this has to happen, you've got to decide this immediately. We got Purcell arguments. In that context, what you're arguing is it was somehow an abuse for the district court to say, I'm not going to hold a separate hearing on your Daubert motions, instead of just like taking it all up in the context of your PI motion? I can't argue that before the court, Your Honor. Okay. Given the factual record. Okay. In the case below. But doesn't that answer the question? Because when you're challenging the amount of time that the district court determined was appropriate for the hearing, how quickly it was held, there's rulings on eliminate motions, you know, for example, those are all subject to an abuse of then we have the record that we have, and there we're looking at the district court's fact-finding to see whether there's a clear error. Correct. And I agree with you, Your Honor, that that's not the primary thrust of my argument. The issue of unfairness in terms of time, the issue of the amount of time that we had to address things in the context, given the weightiness of the issue at the court could have afforded us a little bit more time. It may have, but how does that make the court's findings, based on the record that was developed at the hearing, clearly erroneous? What we're saying is that the application of the findings, the numbers that Judge Jordan read into the record, clearly don't apply here under the circumstances because there is not an issue about placement, giving rise to a constitutional harm. I want to take you up on that because you're making this sort of bright-line distinction between ballot access and ballot placement, but in Anderson and also in Mazo, when we talked about the idea of ballot access, we talked, in Anderson in particular, said the inquiry is whether the challenge restriction unfairly or unnecessarily burdens the availability of political opportunity. And in Mazo, we phrased it not so much in terms of ballot access, but simply what constitutes a discrimination, which is per se a severe burden, as a law that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status. Whether you look at it and put the label on it of access or discrimination, once we accept the fact-finding, isn't that what we necessarily have here? I don't think so, Judge, and this is the reason why. There is no denial of access to the ballot. There is no denial of access to getting on the county line. There is no denial of access to a line on the ballot by any of these judges. I'm confused. Go ahead. Yeah, so my understanding is, you know, primarily with respect to the other two plaintiffs, not Mr. Kim, they're saying we are not running for a pivot point office, therefore, if we don't associate with one of the counties that endorses and has the county line, we will be denied access to an earlier position, a more favorable position on the ballot. Is that also your understanding of their argument? That's what I understand the argument to be, but that's not correct. Okay, tell me why it's not correct. Okay, so the way the ballots, when a candidate files and requests to bracket with other candidates, and if they bracket with a pivot point candidate, in this year's election it will be a United States Senate candidate, those candidates would fall in whatever line, whatever column, that the pivot point candidate drew. So, if the candidates, in this case on the ballot that is in the record that we attached to our brief, in this case, the candidates, the congressional candidates, the kind of down-ballot candidates that associated with Senate candidate Campos Medina, those candidates fall into the first column based on the draw, because they get the ballot position that the pivot point candidate gets. But what if they don't want to bracket with anyone, because they're exercising their associational rights not to do so? Sure, so if they don't want to bracket with anyone, and the candidates, the pivot point candidates are drawn, and they placed in the ballot, there's a ballot draw for the remaining candidates. If you look at this ballot that's coming in Camden this year, and you do the county line based, you'll see that the Camden County Democrat Committee, my client, is actually in column four. And why are they in column four? Why are they so far removed from the so-called prime position of the ballot? Because they had no pivot point candidate. They had no Senate, United States Senate candidate, so they did not fall into the draw for the first three ballot positions. There is any candidate from affiliating and associating with any other candidate on the ballot. I don't think they're arguing that, that they're being prevented from associating. They're arguing that their choice not to associate means they will not end up in, they don't have even a chance of ending up in the first position, because they're not running for a pivot point office. And then you will not be in that first, in that first column unless you're bracketed. And do you at least agree with that? I do. Okay. As long as you're bracketed with a pivot point candidate. Yeah, well that's understood, but I want to follow up because some people have argued that the bracketing actually gives power to the Democratic and the Republican parties, the individual parties, to select a favorite candidate, to say you're the one we endorse, and so you get to use our slogan. And if you're not endorsed by us, you don't get to be bracketed. That the slogans are owned by the parties, and there are rights that are asserted by the parties to say you don't get to use that slogan, because you're not our favorite party. Are those factually accurate statements or not? It's factually accurate that slogans are owned by political parties. And that the parties can say, you're not our favorite candidate, you don't get to use it. But it's not a constitutional violation. That's not my question right now, I'm just trying to, you've taken us down into the weeds, so I'm staying in the weeds with you for a minute. Sure. So down there in the weeds, it's an accurate statement that when you say there's nothing to prevent people from getting bracketed if they want, I'm hearing some different things from some of the people who are chiming in on this, saying that's not true. That in fact, the parties exert control, and that's why they like this system. They like this system because it gives them the power to put a thumb on the scale, because they can say you don't get to use our slogan, or they can say you're the endorsed candidate, you're not the endorsed candidate. Now I just need to know whether those assertions about the party having that power and exercising that power are accurate. It's accurate, your honor. Okay, well then I'm not sure why you can say there's nothing to prevent somebody from being bracketed with whoever they want, because it sounds like the parties can influence that. Parties can influence, Judge, but that's not a constitutional violation, nor does it give rise to... All right, let's get into the Constitution, but now I think we've got a factual foundation for our discussion. First, help me with the analytical framework. You say Anderson-Burdick applies, the other side says Anderson-Burdick applies. I'm just a little bit curious, because at this juncture, nobody who is formally a state actor is a party to this appeal, right? Correct, your honor. Although political parties are recognized under New Jersey election law statutes, once they achieve 10% of the vote in the preceding General Assembly election, and then the New Jersey statutes afford a political party of the Democrat side and the Republican side, in this case as a practical... So you're saying you're a state actor, in effect? In effect. Okay, well then why doesn't that torpedo your argument that you have associational rights to? That's the ACLU's argument, I think, if I remember their brief correctly. They say you can't be hearing them come in and say we've got weighty associational arguments and positions here when they're really trying to stand in the shoes of the state, and now you're acknowledging at the podium we are in effect state actors. So how do those arguments go together? Your honor, under the New Jersey statutes, political parties are given certain recognitions under the state law. I get it. I'm just trying to get you to answer that amicus, the arguments made by that particular amicus. You seem to have embraced part of their argument, which is, hey, these really aren't, for purposes of this ballot discussion, they're not private actors, they're acting like state actors, and you seem to be saying, yeah, we are. So why should we hear you say we've got associational harms? If you're the state, you're the state, you don't have associational rights to assert, do you? No, Judge, for the purpose of this argument, I'm asserting that I have the ability to make these arguments because of the recognition that the New Jersey state statutes give to political parties that achieved at least 10% of the vote in the preceding General Assembly election. Well, answer one other amicus. I mean, there's been amicus interest here, obviously. It's a matter of high public importance to people, which is why you're here. It's why you intervene, right? Yes, your honor. Right. Yes. I think this was the brief from Governor Fulop. Am I saying his name right, by the way? I think it's Mayor Fulop, Judge. Mayor Fulop. He would be governor, the man who would be governor. A number of people would like that brief better, Judge. Yes. His brief says, if I'm remembering it correctly, it says, look, you Court of Appeals people, the only people left arguing this case are political parties. There's the interdictor defendant, and then there's amicus briefs from political actors. And that should tell you that the only interest they're representing is their own interests. It's not any interest of the voters. It's not any interest of the state. It's the political party's interests because this ballot access method gives the political parties power, and that should give you pause. What's your response to that argument? I am representing the Camden County Democrat Committee, and I am representing the Camden County Democrat Committee interests. I cannot dictate, nor can I have any say over what the ballot looks like. That's left to the different clerks of the different counties. What I can argue is that I have associational rights under the Constitution, and I have statutory rights that have been upheld by the New Jersey State highest courts as constitutional. But those statutory rights, the authority that is given to you under state law to make those arguments, isn't it water under the bridge at this point? Hollingsworth versus Perry, Diamond, and it's simply by designating an entity as having authority to bring suit that without a separate injury, without an Article 3 injury, that's cognizable. And I understand you're making two points. One is the statutory authority, and the other is your associational injury. The statutory authority, I guess I'm questioning how you reconcile that with cases like Hollingsworth versus Perry. Well, I look at the statutory argument, Your Honor, as an extension of the decision in Mazo, because the decision in Mazo allowed and recognized certain statutory rights and privileges attached to county slogans and ballot slogans. Here, what we're doing is just extending that. We're not taking free speech into the ballot box. What we're doing is putting descriptive labels on candidates and giving the voters information such that they can understand what candidates are affiliated with who. This is about the voters. What you're trying to say is an arguing that you can't put your slogans on there. They've gone out of their way repeatedly to say that's not our of not being able of the associational harms affected by the bracketing on the ballot. That's how I read it. Now, correct me if I'm wrong, but what is it, I mean, we can argue, maybe we will argue, like how much right do you have to do your sloganeering on a ballot as opposed to off a ballot? But that's, I take it that that's not an issue in this case. The single issue is does the state have an interest that you can assert as a sometimes state actor, sometimes not, I guess, with respect to that bracketing. Is there a legitimate state interest in saying the parties should be able to dictate who that's the issue that we're trying to get you to speak to? Judge, under the law of New Jersey, as it applies to political parties, political parties have the right, whatever affiliation of the political party, whatever faction of political party, have the right to associate with and not associate with, endorse and not endorse candidates. Right. And they do that. Nobody's questioning that. I think we're getting off track here. Mr. Tembusi, the argument isn't, you've repeatedly emphasized the you versus San Francisco County Party, Democratic Party case, but I'm just not even understanding why you think that's so relevant here, because nobody is arguing that you can't endorse, nobody's arguing that you can't sloganeer, nobody is arguing you can't come out hard for The only question is, are you allowed to do that on a ballot? Can you force that kind of advocacy onto the ballot? Is that something that you have, that is constitutionally permissible? That's the argument that's being put to us. In fact, you're briefed at page 30, you say, the office block design, which is the design that the district court ordered be put in place as opposed to your county line ballot that you prefer, the office block design suggested by plaintiffs and as ordered by the court, does not permit political party organizations to identify together the candidates who constitute the association as guaranteed by you. And I read that, I said like, how do, where do you get that? What is it about the district court's decision that makes you think you're not being told not to do by the district court is, you can't force everybody else into this bracketing system. No Judge, I think respectfully, you left out the word, the group word. What we're, what we have on the ballot here. I think I just read that. No, no, you said it, but you didn't, you said the word, you did read the word, but you didn't include it in the analysis. The analysis is this, if you're on the box ballot, and you get to the first column, the first ballot, and you have the president under that box ballot, that president is in the first ballot position. The next Camden County Democrat Committee candidate that's listed is a member of Congress, which is also listed in the first position because that person is not opposed. But when we get down to the Office of County Commissioner, rather than drawing those candidates that decided to run as a slate, that the party endorsed as a slate, to allow them to run together as a group, the Camden County Democrat Committee candidates are in the second position, the fourth position, and the fifth position. So your, so your argument has to come down to this, that it's not just, it's not just constitutional for us to, for the state statute to say the clerks can order this, because that's what it says, it says the clerks can do the ballot ordering, and it also says in another statute that people can associate together if they want on the ballot. But that, in fact, it would be unconstitutional. In the end, your argument is more than that our system is constitutional, your argument is that the office block design is unconstitutional because it doesn't allow you to group. Am I understanding you right? Doesn't allow us to associate. On the ballot. On the ballot. So the issue that I have with that is, by extension, wouldn't you be arguing that the elections that are taking place in New Jersey are unconstitutional? Judge, I'm not going to offer an opinion on the ballots in other states. I think there's a finding of fact in the record that New Jersey is the only state that does the bracketing, so let's, let's assume that. And so it seems to me that if not allowing bracketing, you know, if not having bracketing is unconstitutional, then 49 out of 50 states are doing something severely wrong. And two of New Jersey's own counties. Two of New Jersey's own counties. That's, that's correct, Judge, that they don't. And I'm not saying that they're doing it correctly. I'm saying that they're in violation of the statute. You're saying that, you're saying that, that, that mechanism of the block ballot violates the associational rights of parties. Of the parties, correct. So it's unconstitutional in the 49 states and the two counties in New Jersey that use block voting. Judge Gross, I don't want to opine on the other states because I don't, I'm not familiar with them, I'm not knowledgeable with them. I recognize, I recognize that they do it differently. I recognize that. What I'm saying is that under the statutory construct here in New Jersey, which is at challenge, that furthers the associational rights of the political parties by allowing them to bracket together. And putting that bracket on the ballot is not campaigning. It's informational to the voters. It may be additional, but how do you reconcile your argument with the Supreme Court's decision in Timmins where, in concluding that the sort of cross-designation that more than one party of a candidate, the court interpreted you to say that as long as there's the ability to do these sorts of endorsements to put out, you know, their, their imprimatur on this particular candidate associated with their party and to campaign with that outside of the ballot, that it wasn't required to be on the ballot? Isn't, isn't that analogous to what we have here? I don't think so, Judge, because I thought with the, the anti-fusion statutes that were enacted in that state, I think the difference here is that there is a statutory construct that allows for endorsement and bracketing. And that in and of itself does not violate the Constitution, because there is no infringement on anyone else's rights. But you've been arguing that it's, it's mandated by you and that what the district court has done here in its preliminary injunction, you've argued abrogates you. But doesn't Timmins indicate otherwise? I don't think so, Your Honor. And Judge, I think that the other point that is being missed here is that in order to further the candidates to my last argument, you would have to allow them to have a say in the inner workings of the political party, how the political party goes about awarding its slogan. How so? Because you can't, you can't have... It's about the ballot. This isn't about what you can do outside the voting booth. This is one thing and one thing only. Are you, are you entitled, constitutionally entitled, to take your, not just your sloganeering, because they're staying away from that. They're saying sloganeer all you want. Are you constitutionally entitled to a ballot form that will, according to the facts found by the clearly put a thumb on the scale, that is the county endorsement, the endorsement of the county party will substantially increase your likelihood. Indeed, it may be the determinative factor, not your positions on the issues, not how well you connect with the voters. Otherwise, it may be the determinative factor in the have a dog in this fight, in the sense that we're rooting for one side or the other in any particular election. We are given a factual record and we're trying to get you to engage with that record. And on this record, there's a finding that says there is a substantial difference between being on the county line and not being on the county line that has nothing to do with candidate quality or anything else. It's strictly about ballot structure. On that basis, you're arguing to us that not only is it constitutional for you to be able to do that, but it would be unconstitutional to require you not to have that kind of ballot control. That's the argument you're making to us and I guess what we're pressing you on is, like, what legal authority do you have for that? Because it's not you. You doesn't talk about ballots. So what is it you're relying on when you say, not only is it okay to have this structure, but it would be a violation of your association rights, would be unconstitutional for you to be required to deal with a ballot that is used, a block structure that's used in 49 of the 50 states and two counties in the state of New Jersey. Judge, I look at the decision in Lopez-Torres, the Supreme Court decision in Lopez-Torres, and there, Justice Scalia states, states can, within limits, that is short of violating parties' freedoms of association, discourage party monopoly, for example, by refusing to show party endorsement on the election ballot, but the Constitution provides no authority for federal courts to prescribe such a course. No authority to prescribe what course? Such a course to discourage party monopoly by refusing to show party endorsement on the election ballot. That's what Justice Scalia said. Yeah, and I guess, just like with you, I'm struggling a little bit because they're not arguing on the other side that you can't say who you like and who you don't like. They're not saying that. What they're saying is the structure of the ballot itself is not something that you're entitled to force people into. But let me just move off this to one other thing and then I'll let my colleagues, if they've got anything else. You join in the Purcell arguments at the motion to stay, but Purcell doesn't appear in any of your briefs on the merits that we're talking about here today, and I'm wondering, is that because Purcell actually works against you now? Well, of course, Judge, if you're arguing and say that there's a time crunch, you have to get things done, you can't make the change this close to an election. On its face, it works against us, and my learned adversaries flip the argument very adroitly. But what the issue is here is, what we're asking you to do is to remand this back to the district court with instructions to the clerks to run the ballots in the form that was in existence prior to this court's order, which is... We understand what you're asking us to do, and now I'm asking you to address the Purcell argument that you were pressing before. Aren't you now, you know, you were saying we kind of stand in the shoes of the state here and the state's interests, and the Purcell argument was pressed pretty hard as the state's interest, and now the state's moving in the other direction. Now, you seem to be saying, no, make them go back and I'm putting it to you. Isn't that contrary to Purcell? Aren't you actually asking us to do something which is exactly the opposite of what you asked us to do a week ago? Judge, respectfully, reverting to a system that's been in place for decades and decades and decades, and asking the clerks to rerun the ballots or reprint the ballots in a matter of days over to revert from something that's been in effect for 10 days a week. So, they're not so far down the road that it's any big deal. I'm saying that they're not that far down the road, but I'm also saying, Judge, it needs to be done quickly because whatever the decision is, there's a voter education process that has to be put in place, and there's a voter education process that needs to be put in place so as to allow the voters to identify the candidates that are so endorsed, to allow the voters to understand what they're voting for and how they're voting for, to allow the voters to be able to go into the ballot box with the queue waiting behind them, find their candidates, and vote for them. The straight to county line ballot format that's been in place for decades and decades gives the voters that familiarity. The new ballot system, the new ballot box system, particularly in Camden County, where Judge Qureshi ordered that for each individual office, each individual candidate be drawn separately. So, what you're saying is that there's a real concern the voters won't understand the office block structure? More so than that, Judge. There's actually more nuance than that, Judge. If you look at ballots, office box ballots, and I'm focusing now on that part of Judge Qureshi's order that ordered each candidate for each office to be drawn separately, you're going to find that there will be candidates running under common slogans scattered on that ballot. They won't be in the line. Right. They won't be four, five, six. Yeah. One, two, three. Understood. And that in and of itself creates an unfamiliarity which requires extensive voter education and could confuse the voter, which is the state interest here. All right. We got you. Do you have anything else? A couple questions. In terms of this voter education and the ability to communicate your endorsement, we again have the Mercer County as an example, and the office block balloting is pretty self-explanatory. What do we do with the district court's finding that comparatively, that bracketing is more confusing to the public? The Mercer County situation was an anomaly in any election. There were two. First of all, it was paper, and the ballots were paper. There was over-voting on the ballots, which negated votes. That over-voting. A large number of votes, right? A very large number of votes. A large number of votes. That over-voting will not occur on machines, because the machines will not allow you to vote for two, where you're only to vote for one. Well, doesn't the COVID thing provide a great experiment, then, to show that the bracketing is not the intuitive thing you're suggesting it is? Because when the machine can't stop you from doing it, people over-vote in large numbers. When the machine can't stop you from doing it, the uneducated voter votes in large numbers. And if there's not an opportunity for the voters to be educated, like there was during, like there wasn't during the COVID years, then you're going to have voter confusion. To pull out one election in the course of all the elections and cite that, it was just an anomaly. I'm looking at page 13 of your reply brief, where you provided a sample Camden County ballot for this June 2024 election. And I look at this, and I see the office block layout, and I see quite clearly, although a small print on my paper, Camden County Democrat Committee Incorporated listed below. If I were a Camden County voter, and I wanted to vote for those folks endorsed by your client, I could just go through and look for that and tick off those boxes. And so, how much education is needed to do that? Well, it's different, Joyce, than what it's been for the last decades, where all of the candidates under the common slogan were bracketed together. I understand. I understand it's different. But nonetheless, I think this lends some credence to the district court's factual findings that voters will figure it out. And in fact, they could just look for your client's name scattered throughout this ballot. Well, I think that that's what this is about. This is about the voter, not the candidates. The purpose of the ballot is to make it easier for the voter, not the candidate. The voter shouldn't have to hunt and peck through a ballot to find certain candidates. If the voter wants to go in and vote for candidates endorsed by the political party to which he or she supports, or is a faction, they should be able to find those candidates easily. And how about the voter that doesn't want to vote a straight ticket? The voter who doesn't want a straight ticket can do that just as easily on the line ballot, the county line ballot. Certainly not. That's the fact finding we're dealing with. When you say they can do it just as easily, I don't know who coined the term ballot Siberia, but somebody did. And people are feeling like it's not as easy. And we've got a record in which the district court took factual testimony, heard it, and said, I believe that's got a real and a negative effect. So it's not as easy. Respectfully, if there's ballot Siberia this year under the county line ballot, the Canada County Democratic Committee is in it. Because? Because they're in column four. Okay. All right. A couple other questions. The district court independently based its decision on the elections clause. And in your briefing, you don't seem to have addressed the elections clause arguments independently. I didn't brief it independently. But I think that really, Judge Karashi didn't give a whole lot of time and attention to that clause. The substance of our argument is that the states have the right to strike ballots and have the means, manner, and method of striking ballots in an orderly fashion under the election clause. And the ballot that provides the voters with the easiest way to ascertain those candidates was part of our argument. But what they can't do in regulating time, place, and manner is to favor or disfavor any group of candidates. Correct, Judge. That would be an election clause violation. Correct. The district court made factual findings that the racketing system does favor and disfavor particular groups. I can't dispute that, Judge. I can't dispute what's in the record. But the fact of the matter is, whenever I see an expert report that has the word nudge in it, I immediately think about what my downward deposition is going to look like. And that's what the experts here said, that it nudged the voter. But do you agree that— But, Judge, if I just might finish, the clerks are just following the statute. Let me just get your yes or no to this. If we conclude that the district court's findings are not clearly erroneous, do you concede that we then have a violation of the elections clause, per se? I do. Okay. Well, thanks very much, Mr. Timbers. Judge, I reserved three minutes for rebuttal. Well, since we gave you about a half hour worth, you can have your three minutes for sure. I may not use those, Your Honor. Yeah. Now, you'd asked, and we said that your colleagues, if they wanted to have time, could have time. So we will be a little more attentive to the clock with them. But go ahead, and we'll hear from the New Jersey Republican Chairs Association. Good morning. My name is Matthew Mensch. I'm from King, Mensch & Collins, and I'm here on behalf of the New Jersey Republican Chairs Association. I may be the only Republican in the room. I'm not sure. But we have an interest in this case, even though it evolved out of a Democratic primary, because of the consequences which have now taken place since that time. Your Honor, I asked about Purcell, and I'd like to spend the first part of my time here talking about Purcell. Because the argument was raised below, and was obviously rejected by the district court. The district court found that because it was brought 100 days before the election, that it was not untimely, and therefore should go towards a conclusion. In the Supreme Court jurisprudence, and many times, Judge Kavanaugh has written on this a few times, talking about Purcell. Judge Kavanaugh specifically mentions the fact that having clear rules of the road is a bedrock principle of election law, and that courts should not be changing the rules close to an election. Yeah, that's all true, Mr. Mensch. But the argument made by Congressman Kim is, until the county line was established, anything I said would have been said by the same people who are arguing against me now on timeliness, would have been said to be premature, not ripe, and purely speculative. What is wrong with that argument? So when it comes to standing, certainly I think there's a capable repetition, and there's standing to bring the case. But his argument is, the assertion would have been made, I had no standing, because nothing had been decided. So I brought this at the earliest possible moment. If that's true, and I'm giving you the chance to say whether that's true or not, but if that's true, then doesn't it have to be the case that this is not a Purcell violation? Because otherwise, you would make it impossible for anybody to ever raise the challenge. No, Judge, because the Purcell argument focuses on not when the case was brought, but when the court makes a decision, how close that is to the election and the implications from it. So in this case, the harm... So you're saying the court took too much time by giving a month for the parties to get ready? Judge, what the court could have done, hypothetically, the lower court could have come back and said, I have concerns on this issue. I believe maybe the situation is unconstitutional, maybe it's not, but I have concerns. But the court didn't have to issue an injunction for this election. The judge could have denied the injunctive relief and moved the case forward. There's a case right now pending, Conforti v. Hanlon, on this exact issue in front of the same judge, which has been pending for about two years for discovery and fact determination and things like that. In this instance, when the judge issues an injunction and says that the lower court focused mostly on, can it be done? Can the machines be changed? And there was factual record about it can be changed. I'm not conceding that. But I can tell you from our experience on the Republican side, what's happened in the past 12 days because of this ruling has been mass confusion. What exactly what Justice Kavanaugh has warned about... And why is there mass confusion when you came forward and said, hey, does this apply to us? The judge immediately said, no, it doesn't apply to you. I agree. And we were real happy for about 24 hours, Judge. And then what happened was some of the county clerks started to individually started to question whether or not they had to allow us to do bracketing or whether they could decide not to bracket. So we had a case. We had to bring it. Actually, right now, while we're sitting here talking, there's a case occurring in Burlington County, Superior Court, where Republicans have now brought a new case based off of this case. All the ballots are currently... There's counties that are joined, so ballots are not being printed because there's a brand new case by Republican challengers saying, well, if the district court has ruled that there may be issues here, should now a state court judge preclude Republican ballots from going out? So at this point in time, it's... So just so I'm clear, you're here arguing in support of the CCDC's position, the Camden County Democratic Committee's position. Correct. And you're making a Purcell argument. Correct, Judge. But you yourself have brought a lawsuit in Burlington County to stop a change? No, Judge. Make sure I'm clear. There's two different... Yeah, that's what I'm trying to understand. Yeah, let me just make sure I get the procedural record correct. There's two different lawsuits currently pending in Burlington County that were brought following this. The first one was brought by us on behalf of the Burlington County Republican Organization. Saying what? Saying... Saying we like the bracketing. Don't mess with it. Correct. Because that clerk, the only one in the state who wasn't going to honor traditional bracketing for Republicans, that clerk said, I'm not going to do it. So we brought a case saying, right now, the district court said it doesn't apply to Republicans. There's a statute that says we have a right to bracket. At least for the moment, you have to honor the statute. Yesterday, the judge denied the injunction saying that we aren't entitled to it because the law is now unsettled. And so because the law is now unsettled as a result of this case, that that clerk can now move forward. So right now, in that case, the only county right now in New Jersey, other than the two that don't do it, which is that they're outliers, but in this instance, we want to bracket. The state law would permit us to bracket. The injunction doesn't apply to us. But in that county, Republicans aren't going to be able to bracket. So the district court, separately judged, another group of Republicans, kind of similar to Andy Kemp, Congressman Kim and plaintiffs here, who are unendorsed Republican candidates, attempted to intervene in the district court. District court said, no, you're too late to intervene in this plenary injunction. So these Republicans then went to state court and said, hey, you know, if it's not good for the Democrats, it shouldn't be good for us. So right now, 12, 13 days after the district court's injunction, ballots are still not being printed in some counties in New Jersey because there's still unsettled law. Nobody knows whether or not the injunction is going to apply to Republicans or not. We don't know whether the ballots will be printed or not. I was following what you were saying right up until you said that. Sure. I don't understand there to be any confusion about what the injunction that's in front of us says. Because Judge Gretchen was clear as a bell. The injunction does not apply to Republican ballots. Now, how county clerks choose to interpret that and where you choose to sue and all those things, those are not unimportant, I know. But they're not in front of us right now, right? Understood, Judge. But I think that goes to the Purcell argument, ultimately, which is why Purcell says that district courts should not be issuing orders right before an election because there's unintended consequences. It doesn't say that. It says that district courts need to be cautious and need to consider things. And they need to consider the impact on voters, whether there will be voter confusion. And here we have findings of facts that the voters will not be confused. And, in fact, the status quo was more confusing. And then they also need to – let's see. So they need to have time to resolve factual disputes. And the court took that time, had the hearing, and issued a lengthy opinion resolving factual disputes. So what's the problem here? The problem here is that because of the order being entered only a week before ballots were supposed to be printed initially, the injunction right now has and continues to have continuing legal impacts in New Jersey. In other instances, they're not before this court, but the fact that the order exists is now causing additional confusion not just to the voters because Purcell and the cases I've interpreted don't just say we look at the confusion to the voters. We look at the overall impact on the election, the administration of the election. And right now this order is impacting the administration of the election because by its issuance, by the fact that it's here, now it's created unsettled law for everybody else. I see that with – I see your argument with regard to the Republican primary. But with regard to the Democratic primary, if there were continuing problems with the administration of the election, I would think that some of the many county clerks that were in this appeal would have remained in the appeal to make that argument. Correct. And the record doesn't reflect it. I don't know why they ultimately chose not to appeal. I can gesture, but that's not what we're here to do. We just know that they're not here. But right now in many counties, no ballots are being printed for anybody because the election is not moving forward. And you think that that would be cured if we sent this back to the district court and said, hey, you shouldn't have done this? How would that fix it? And how would that not just compound the problem? Sure. I mean, the other side is arguing. You heard Mr. Tambucci have to address it. The county clerks who were in the case, they've all dropped out of this appeal. Evidently, they're all moving forward on the basis of the injunction, and that's been going on. And your argument to us now is we would make it better by telling them, stop, go back. That would cure and not compound the Purcell problem you're suggesting exists. Correct, Judge, because right now the process isn't moving forward. Well, it's certainly moving forward on the Democratic side, right? To some degree, Judge, I don't know who's waiting on what the rulings here may or may not be, but it's impacting the election. And on top of that, Justice Kavanaugh has said that the Purcell arguments, you can't use Purcell to overturn a Purcell opinion. Well, I'm not sure he said that, but we have your argument, and we appreciate your standing up. Thank you. We're going to go ahead and hear from Mr. Morota for the Middlesex County Democratic Organization. Thank you, Your Honor. Sean Burrata on behalf of the Middlesex County Democratic Organization. I want to try to make five points in my time at the podium, and I'm going to say up front, I think my position is going to disagree with my friend from Camden to a certain extent. Because if you're only going to say the same thing he did, I hope it'll be shorter than five minutes. Exactly, Your Honor. First, we are not arguing that office block format is unconstitutional. Rather, from my position, what we're saying is we have an interest in the column and row, which is hurt by the creation of the injunction because, as the district court found, bracketing does benefit political organizations by allowing people to easily vote down the line for the candidates that are endorsed by organizations. That is an Article III harm, even if you don't think it's a constitutional injury, such that it would be unconstitutional to take it away from us. And second, our argument is that – Does that raise a prudential standing argument? I don't think so, Your Honor, because – If your assertion boldly is this is about us, it's not even about the voters, it's about us. We've got an interest. We, the parties, have an interest in doing what we want to do here. But it's about the voters who support our candidates. That's not a state interest. That's not a voter interest. That's your own interest. Well, it's our own interest that is sufficient, I think, from the Camden County side to intervene. And then what we are asserting is the state's interest in defending the constitutionality of its statute, where New Jersey has concluded that the best form of a ballot is one that allows people to easily vote for candidates who share a common slogan. What do we do with the New Jersey Attorney General's letter? The New Jersey Attorney General, and you have no doubt seen it, came out and in the most explicit, detailed, emphatic way said, You know what? These New Jersey statutes are indefensible. They're unconstitutional. They create problems which we cannot defend. So when you say, you know, the New Jersey's position and the New Jersey state interest, should we be paying attention at all to the one statewide elected official who is entitled to speak to the state's interest? I think the New Jersey Attorney General is entitled to his opinion on the constitutionality of the statute, the same as anybody else in this room. But the New Jersey state interest... He's not just anybody else in this room. He's the state attorney general. He is the state attorney general. And in this particular case, he's declined to defend a finding of the state legislature, which, again, has been upheld by the New Jersey Supreme Court. We know what the New Jersey's interests are because the New Jersey Supreme Court and Karembi told us what they are. Did any of those cases have the factual record we're dealing with here? It did not. Well, Karembi was before Anderson-Burnett, so it's before that. And I want to talk about the factual record because that's my second point, Judge Jordan. I think the Camden County Democrats can win this case even if you take the record exactly as the district court found it on page 35 and 36 of the appendix. Page 35 and 36 of the appendix say that those statistics that you gave us at the start of the argument, Your Honor, 80 percent, even plaintiff's own experts primarily admit that is primarily the effect of endorsement. It is primarily the effect that voters in Democratic primaries tend to vote for the people that their local party organization endorsed. When you take away, when you control for what the endorsement effect, plaintiff's own experts say it's about 11 percent. But no one's taking away the endorsement. They're taking away the primacy. I'm saying when you control for endorsement. In other words, when you control for endorsement because they are not challenging the fact of endorsement. There's still between 11 and 12 percent, which doesn't – yeah. Is that still a thumb on the scale? It may not be an elbow and a fist or your whole body on the scale, but isn't that still a thumb on the scale? Well, there are two responses to that, Judge Jordan. First of all, this court in Mesa said for a burden to be severe, it's not enough that it makes it harder for particular candidates to win an election because it's true that lots of things with ballot design and ballot access make it hard for certain candidates to win. So, for instance, minor parties. You cannot get elected in the vast majority of this country unless you are the Republican or Democratic nominee for something. And that creates a natural incentive to associate with the Republican or Democratic parties. And yet, the fact that that is true is not a severe burden and is not a constitutional violation. Hold on just a second because it sounded like you might have just been making the argument for the other side. I don't think so. Well, yeah, it is true that it is near impossible for a third-party candidate to get elected. And I'm not speaking for him, but based on the amicus briefs and the brief from the parties here, the appellees, I would anticipate an argument like this. That's exactly our point. It's exactly our point. That may be their point, but courts, time it again or reject the argument. You've got to stop while I'm speaking. It's an artificial thing, but you've got to stick with me. I understand their argument to be this ballot design is part of the duopoly's power grab. They don't want anybody else to have a fair shot at the office. They don't want other people to see these other candidates. And this is just one more tool that the Republican Party and the Democratic Party use to keep voters from having a fair shot at understanding what their options are. Don't let them do it. That's the gist of the argument. You seem to be saying somewhat the same thing, which is everybody's going to vote Democrat or Republican anyway, so who cares? And I guess their argument is we care and the voters should care and the state should care, and adding to the problem with a bracketing system is not constitutionally required. In fact, it's unconstitutional. That's the argument you should be addressing, and I know you're endeavoring to do that, but go ahead and take a couple minutes and tell us why that would be wrong and why something between 11% and a 12% difference that can only be accounted for by bracketing, according to the experts, is not something that, in fact, favors parties and disfavors non-party people in a severe or significant way under Anderson's verdict. Sure, so let me give you two answers, Judge George. First, with respect to the duopoly. The duopoly system that, as you phrased it, Democratic-Republican organization versus Guadagno, decision of this court, and that is general elections in New Jersey, where general elections are there is a draw for position between political parties, political parties being defined as those who have 10% or more support in the last General Assembly election, which means Republicans and Democrats. Republicans get one column. Democrats get another column. Independents get a single column where they're all stacked on top of each other, whether they're associated or not. This court upheld that system. And the Republican column and the Democratic column, that's bracketing. Part of the reasoning was a lack of empirical evidence. We have that empirical evidence in the record. So two things, Judge Krause. First of all, one of the findings was we don't have empirical evidence. The second was even if there was empirical evidence, there's still not a severe burden, because, again, there is an interest in that case, it said, to allowing support for the two parties that had shown that they have significant support among the voters. And second, there was interest in allowing voters to vote a party line. Essentially in this case, the organizational line is equivalent of a party line. It is the equivalent of that if you are a person who wants to go vote for the people who are endorsed by the, you know, Middlesex County Democratic Organization, you can go straight down the column. And New Jersey has done that valuable. Do they have to? No. Isn't everyone on that ballot a Democrat? Everyone is a Democrat. I think that is absolutely right. Tell me if the county line does not exist. You've got to stop. You've got to stop. In ordinary conversation, we speak over each other, and that's natural and okay. But we're going to go back and try to listen to this. And it doesn't work if people are talking over each other. So let the judge speak, and then you can speak. Of course, Judge. So how does the county line equate with the distinction of using major parties, which granted the Supreme Court and Jeunesse and Timmons gave the nod to that. But here we're talking about a particular committee's endorsement. It's not one that distinguishes one party from another party. Well, it distinguishes one faction of a party or one group of a party who share a certain set of views or a certain association with each other from a different faction of the party. Because if you hate the Middlesex County Democratic Organization, the fact we're bracketed together means you can vote for anybody else I'm about. And that gets my second answer to your question, Judge Jordan, which is the benefit of bracketing does not fall upon county organizations. It falls upon anybody who has the organizational wherewithal to create a bracket around a pivot point candidate. So on page 11 of the grade brief, the South Jersey Progressive Democrats who obtain first ballot position under a column and row system, they have the same benefit, essentially, of the weight of the line because they have a nice, neat column of candidates who are in first position. But what about Ms. Rush and Ms. Schoengood, who are not running for pivot point positions and who want to exercise their right not to associate with other candidates on their ballot? And what about their inability to obtain a favorable ballot decision? I think they're essentially no different, Judge Freeman, than minor party candidates in general elections. Minor party candidates in New Jersey, as in many other states, Virginia, and we cite the Fourth Circuit opinion, which I think is quite on point in this, they can't draw for excellent ballot position because they haven't bracketed with a pivot point candidate. But their associational rights are not infringed because if you want to vote for them, all you've got to do is you've got to find them on the ballot. I don't understand this. In a general election, the ballot will be organized by office. And so the only question is whether they'll be, you know, first among other candidates for that particular office. But are you telling me that there's some sort of bracketing in the general election as well? In New Jersey, there is. In New Jersey, there is, again, the two major political parties. It's not defined by major political parties, but it effectively is the two major political parties get a bracket of their candidates, another bracket of their candidates, and they draw by position. So it's random whether it's Republicans or Democrats who get the first column. And then all of the independent petition candidates are put in the third column, stacked on top of each other, even though they're not associated with one another. And this court upheld that. Okay. All right. Thanks, Mr. Marotta. Thank you very much. Appreciate your argument. We'll hear from counsel for the athletes. May it please the court, Brett Pugash from Weissman and Mint on behalf of the plaintiffs' appellees. New Jersey's convoluted primary election ballots are a national outlier. They don't use office block ballots, but instead use ballots organized around the county line. Yeah. I think you will recognize by now that we get that. So let me ask you about Anderson-Burdick and its applicability here. You've made an Article III and a prudential standing argument in your answering brief. And yet you say Anderson-Burdick applies. And I'm just asking for your help in understanding how those positions coexist. Because since Anderson-Burdick requires a weighing of the state's interests, how can you ask us to weigh the state's interests at the same time you're telling us, hey, don't let them say anything about the state's interests because they've got no right to talk about it? Well, Your Honor, they're not a governmental actor. That's not my question to you. We will get to that question. I'm addressing and trying to get you to address what appears to be an internally inconsistent position, and maybe it's not, and you can help me understand. On the one hand, you say apply Anderson-Burdick because that's the legal construct that should govern here. On the other hand, you say don't listen to anything they say about the state's interests. They've got no right to talk about it. And I don't understand how you can say both those things at the same time. Your Honor, one way to coalesce those is to say that there is no evidence of the state interest in this record before this court. Well, there is. There's a whole bunch of record. There's evidence that was submitted by the county clerks. They're not in this appeal, but they were in it below, and they made their record as best they could. Your Honor, that record was limited to Purcell. There was no evidence of what the state interest was. There were assertions of state interest, but there was no record to actually support that. And here, where the district court found that there, under the Anderson-Burdick standard, that there was a severe burden on the plaintiff's rights, the state interests are scrutinized more carefully. And there's just nothing in the record at all. This is a case of a robust record on the one side and an absence of a record on the other side.  Do you contest that they have those interests? They have an interest under the Anderson-Burdick standard. They asserted associational interests. That interest is already being addressed, and the district court found that it's already being addressed by the slogan itself. Right, but, I mean, do you... If you went back for a more fulfillment and lengthier hearing on all the issues, would you present evidence that they don't actually have an associational interest in bracketing? No, I think the Anderson-Burdick standard requires a weighing of all of the state interests and a weighing of all of the burdens. They have to do that. Yes, Your Honor. Under Anderson-Burdick, there's a weighing of the burdens, there's a weighing of the state interests. They articulate on the other side what the state's interests are. Should we pay attention to the argument? Absolutely, Your Honor. And Your Honor should look to the district court's findings in that regard. And so, in terms of the findings in this particular case, there's expert scientific evidence that's in the record from a cognitive behavior perspective of voters to historical analysis and data over 20 years of primary elections. There's an experimental design study that's tied to the particular upcoming election cycle as well as... And we're familiar with all that. On this point, that is the evidentiary point, why don't you address Mr. Tambusi's assertion that we should not be giving that much credence because the district court failed to give the clerks and the CCDC a fair shot, that there was not enough time to develop evidence for them, and that nine hours wasn't sufficient to address the multitude of issues raised by the factual assertions that your experts put in play. I mean, I haven't put it as artfully as he did, but I understand that to be their point. Your Honor, there was the nine-hour marathon evidentiary hearing. There was a cross-examination of expert witnesses. There was also various briefs and eliminate motions and responses in supplemental certifications submitted by the experts. And all of that was in front of Judge Horati. I'd also note that in the Conforti matter, which is a fairly similar issue to this one, the Camden County Democratic Committee did intervene. So they've been involved in this issue in litigation for over two years. And so they've had every opportunity. A district court's not even required for a preliminary injunction to have an evidentiary hearing. And I think the problem here is that, whether it's Anderson verdict or a preliminary injunction, which are high bars for plaintiffs to meet, they often fail because plaintiffs don't bring the kind of evidence that we brought here. And so the argument that we're hearing on the other side is that the plaintiffs brought too much evidence. The evidence was too good that we didn't have a chance to deal with it. Well, I took the argument to be a little different, which was the plaintiffs had a lot of time to think about this and prepare for it, and then they came out of the box when it suited them. And we didn't have enough time to do it ourselves. But you've answered that to a degree. Let me ask you this, again, on Anderson verdict, because you just made it sound like they're either or. Does Anderson verdict fit into a traditional preliminary injunction analysis? That is, you know, everybody knows the four factors. We don't need to run through them here that are associated with getting a preliminary injunction. Is Anderson verdict something different than that, or is it something that you take account of when you're actually in the weighing prong of the traditional standard or in the likelihood of success prong? How do you see that working? Well, Your Honor, one of the prongs is likelihood of success. And when the court, the district court, looked to the likelihood of success, it properly applied the Anderson verdict, which was the appropriate standard. So they're not, I might have misheard you, but it sounded like you were saying it's an either or. You'd acknowledge that Anderson verdict fits into the traditional analytical model. It just shows up in prong one. Am I hearing you right?  It's part of the analysis of the likelihood of success on the marriage, Your Honor. Could you speak to the implications for the general election and how the position you're asking us to take would square with Diagonal where, while we didn't elaborate at length, we did endorse the reasoning of the district court, and that included that being listed to the right of other candidates was at most a minimal burden on plaintiff's valid access. So I would say a couple things, Your Honor. Number one, or three things. That case dealt with the general election, and it dealt with a different factual record, and it was a case that dealt strictly with ballot order and not some of the additional harms that we bring here. As to it being a general election and not a primary election... Sorry, isn't ballot order exactly what we're dealing with here? Your Honor, it's one component of the harms here. So, for example, an unbracketed candidate has no ability to draw for first ballot position. But there's also the weight of the line, and the district court's findings in this case as to the weight of the line, as well as just the effect of bracketing itself. In addition to ballot order, those are all harms that our experts who were accredited found to have over double-digit advantages in favor of certain candidates over others. Why wouldn't that apply just as well to a general election ballot where if there are minor parties, they may not have candidates for everyone? Well, Your Honor, it wouldn't apply... It may apply, is what I would say, is that the factual record in Gridano, and one of the main holdings of the case there, was that there was no evidence. There was no empirical evidence and no affidavits, specifically what Chief Judge Wilson said. And that stands in contrast to this case here. But, you know, as far as the weight of the line is concerned, there are specific factual findings that the district court made in this case. We don't know what the evidence is as to a general election ballot, what the impact is. And as to the state interest, in a general election, the Supreme Court in Timmins found that there could be a state interest in preservation of the two-party system. That is a state interest that has no application whatsoever to a primary election. So it is a little bit of apples and oranges in that respect. No, why not? You know, we've just heard from a representative of the Middlesex County Democratic Organization saying there are factions within parties. You know, it's the nature of political discourse. You can try to have a big tent and you'll still have people punching each other a little bit inside the tent. And the party organization itself ought to have some right to say who they think has got the better of those arguments and who they want to get behind. Why isn't that the very same interest that you've just said, oh, in the general election, it's okay. Why isn't it okay in the primary election? Well, because in Timmins, it spoke to the preservation of the two-party system. Here in a primary election, everybody, you know, regardless of faction or if they're part of a faction or they're running independently, they're all Democrats. So there's only one party that would be preserved, not two parties. So it's something that's entirely different. So let's just stick on that for just a minute because I'm not sure I'm following. Doesn't that drain the word party of all meaning? Because what you're really saying is as long as you hang the label on yourself, the party organization, it doesn't have any interest in making sure people know that you're not really part of the team, right? You know, you hear words get thrown around like rhino, Republican, and name only, and you hear on the Democratic side, I'm sure, I don't know what the term of art is on that end of the political spectrum, but where people are saying, you claim to be with us, but you're not with us. And we as a party want the world to know you're not with us. That associational right that we have as a party should have real weight here. That is, in fact, part of preserving the two-party system, not diluting parties to the point where they have no meaning. In fact, I think maybe I've misunderstood, but I take that to be part of the argument that they're making when they make their associational argument. What is wrong with that argument? Your Honor, the vast majority of states don't even have a slogan on the ballot, and the ballot's not supposed to- It's not responsive. With all respect, I'm trying to get you to address the argument, and now you're addressing a different argument, or it sounds like that's where you're going. I'm trying to get you to address the argument that they're making to us, which is we have associational rights ourselves, and we're entitled to have those respected in the primary election, just like in the general. That's the argument I'm trying to get you to address. And, Your Honor, the district court found, looked at that, it looked at that interest and said that that interest is already being protected via the slogan itself. That's how I'm trying to tie the two together. In other words, states don't need to have a slogan, but New Jersey goes above and beyond what other states do to give even more credence to associational rights. What they want is really more than the slogan, because we're not challenging that here. They want the benefits of having the visual alignment, and they even take the position that that's a constitutional right, which is contrary with 49 other states and two counties. Well, I take their argument to be slightly more subtle than that, which is the problem here is not severe. Under Anderson Burdick, the plaintiff at Belize had to show you the burden was severe. And you heard Mr. Morata say take the evidence on the terms that the plaintiff at Belize put to you and that the district court accepted. It's about 11.2 or 3%. That's the difference. And that's not, you know, and the assertion is that's not severe. So what's the answer to that? The answer is that the district court weighed all the evidence and found that it was severe. And Anderson Burdick is not, it's not a bright line rule standard. Do we look at that decision by the district court as a factual finding or as a legal conclusion? Because those are two very different standards of review that come into play. Is the judge's determination that 11.2% is severe, is that a fact finding or is that a legal conclusion? It's a combination, Your Honor. It's based on... What standard of review do we apply? Well, the underlying findings behind it would be we would apply a clear error standard. Sure. The 11.2%, that's clear error. Now we're saying that's severe. If you say, once you characterize it, is that a legal conclusion in the same way that you would say, I know what you did, now I classify that as trespass. Or I know what you did, now I classify that as negligence. I know what you did, now I classify that as an antitrust violation. Is the classification of it as severe, a legal conclusion subject to de novo review? Your Honor, it might be, Your Honor. It might be subject to de novo review. And what I would say is that the district court also found that the state interests were not sufficiently weighty to outweigh the burden. So in other words, even if the court didn't apply a severe burden, it's still a sliding scale analysis. And as I mentioned before, there's no evidence in the record as to the state interests, and the court weighed the evidence and made the determination that those interests were not sufficiently weighty to overcome the burden. So the amici have suggested that what you're really arguing for is an entitlement to the votes of voters who just reflexively are going to vote for the first position. And if that's so, if we think of this as just the windfall of voters who are not closely examining the candidates and issues, why is there a severe burden on your associational rights? How does the fact of many or some number of voters simply going down the county line mean that you have rights severely burdened by not being able to take that first slot? The severe burden, I think, stems from the findings that were in this case. It almost seems the other way around, as if the county parties feel that they're entitled to any kind of windfall vote. But the evidence in this record from the plaintiff's experts shows some of the cognitive behaviors that match the findings of Dr. Passick's report, for example. And he found straight-lining behavior. And so what was really happening is that there are, and this was credited by the district court, Dr. Passick found that even in instances where voters had a meaningful preference between voters or between candidates, they're still getting nudged by the design of the ballot itself. And so given that and the magnitude of the... Does the word nudge sort of play against the idea of severe? It doesn't, Your Honor, because the word nudge is also backed up by the empirical evidence of the size of the burden. So in other words, when you look at the weight of the line, as well as you look at primacy, as well as you look at bracketing itself, each of those things were found to have, on average, over double-digit advantages. So the word nudge may refer to the cognitive behavior, but the impact that it's having here is what contributes to the severe harm. Let's say it is severe. Why isn't there a compelling interest, as recognized by the New Jersey Supreme Court in Coremba, in allowing these groupings for better service of the public interest and for allowing both voters to identify those who share their common values, principles, and for the parties and candidates to be able to fulfill those associational interests? Your Honor, as stated before, the associational interests, and Judge Qureshi found this, the associational interests are already being protected by the ability to have that slogan. And Coremba, interestingly enough, was decided, and I think it was just recognized by counsel before, was a case that was decided prior to Anderson's verdict. So they didn't even look at what the burden was. All they looked to was if the county clerk's exercise of discretion was rooted in reason, and they didn't weigh the actual burdens and the state interest in that case. So we think it's, under an Anderson verdict analysis, it doesn't have that same persuasive value. Is there any New Jersey case from the Supreme Court or a lower court that has suggested that Coremba is no longer good law? Your Honor, I don't know if there is, but part of that stems from the fact that there was a decision in 2004, the other case that's cited by the Camden County Democratic Committee, which is the Schindler case. And that case, as we explained in our papers, is rooted in a misunderstanding of you and trying to extend the principles of you onto the ballot itself, which again is at odds with, the court in Schindler said that you find that there is a right to associate on the ballot itself and to endorse on the ballot itself. And so the court invented a right to bracketing on the ballot, and that's what's been existing in New Jersey via New Jersey case law. That decision is highly problematic, and it's at odds with the two counties, as Your Honor recognized before, the two counties, Salem and Sussex, that don't use it in New Jersey, as well as the 49 other states. It also speaks to the state interest. How compelling can the state interest be if two counties aren't even doing it and if no other state finds it necessary? There's nothing in the record that says what's so special about New Jersey that they need to have, that this is necessary. Well, New Jersey's pretty special. I'm not doubting that, Your Honor. And speaking of New Jersey, the New Jersey attorney general did submit a letter, and I'm wondering what to make of that, right? Kind of got poo-pooed a little on the other side. He's entitled to his opinion, but he's not just anybody. On the other hand, he didn't intervene in the case below. Judge Qureshi seemed to say, I'm not going to really pay attention to that because he's not in the case. Should we be paying attention to that? Your Honor, I think this court should pay attention to that. So it is in the record. It's just that the district court chose not to rely on it, and in this instance, they didn't have to. But we think it's certainly something that this court should consider. Among the other evidence, this is the individual in New Jersey that is charged statutorily with defending the constitutionality of state law. And so their fact of not getting involved, of not defending the constitutionality, is itself judicially noticeable. It's a thoroughly explained fact, right? That's correct, Your Honor. And the reasoning there matches with the position that plaintiffs and appellees have taken in this case. Can you address, again, your friends on the other side of the aisle, including Amici, who suggested that if we affirm, the district court, that we will be creating a circuit split with various circuits that have suggested, for example, the court that it's a more modest burden on constitutional rights to treat ballot placement as implicating the First Amendment or elections clause and requiring it to be treated as, instead, under strict scrutiny. What's your answer to that? Are we stepping into a circuit split? Your Honor, this court would certainly not be creating a circuit split to uphold the injunction here. In fact, the most recent ballot order case, and I stress that it's strictly ballot order and not the other harms that we have here, the most recent case that was decided was the 2022 decision, Messina v. Hobbs from the Ninth Circuit, and they overturned the district court that had a similar view on this and remanded it back. It all stems back to Anderson-Burk. This is a fact-intensive standard. Just because in one particular instance a court may have found that there is a modest burden or isn't a modest burden on a particular factual record doesn't preclude the district court, as they did in this case, from doing an independent review of the burdens and the state interests. Okay. Thanks very much. Thank you, Your Honor. I appreciate your argument, and we'll hear from Mekus for the League of Women Voters. Good morning, Your Honors. May it please the court, my name is Ryan Hagood from the New Jersey Institute for Social Justice, and I, Your Honors, would like to say a word on behalf of seven state and national racial justice advocacy organizations who serve as amici cari in support of plaintiffs' appellees on a word about how the county line imposes substantial burdens on voters. As we argue in our brief, we think of the county line as New Jersey's sophisticated form of voter suppression. So while voter suppression elsewhere may be perpetuated through photo ID, or proof of citizenship requirements that outright block voters from voting, the county line in New Jersey operates in a different, though also pernicious way. And while the district court correctly determined that the First Amendment burdens on candidates' plaintiffs were severe enough to trigger heightened scrutiny, the record here demonstrates that New Jersey's county line imposes severe burdens on all voters. And so I'd like to say a word about how voters experience the county line. This is true that there's a severe burden on all voters. As a person who leads a racial justice organization, as I do, I'm also particularly aware of how that burden ends up being felt disproportionately by black and other voters of color, limited English proficiency voters, and new citizens. Well, speak to the record, Mr. Haygood, and speak to the arguments that are being made by the other side. The other side says, and I'm not aware of anybody, maybe I have not attended to it carefully enough, but I haven't been aware of anybody suggesting that there's a racial component to this. Sure. Did I misread the record? You didn't, Your Honor. So the truth is that the county line burdens all voters. Okay. Let's stick with that then. If it's burdening everybody, and it's burdening everybody equally, I guess the other side would say, yeah, it's a level playing field for everybody, you know. And what it does to everybody is it requires people to vie within their Democratic or Republican, because we're talking about the primary ballot right now, to vie within that organization to try to get their endorsement. And that's fair and good, and the party itself should be allowed to do that. It's in the nature of political parties and groups of people coming together as political entities to choose their standard bearer, and that that associational interest is real and significant and should be attended to. Why shouldn't that weigh significantly, as we're talking about this Anderson verdict, weighing it we're called upon to do? Judge Jordan, so I think that may have more traction than the 49 other states that don't use the county line. But in New Jersey, the voters are relieved, to put it charitably, of the power to decide whom they vote. So in our state, the way that voters express the county line is that county parties, and especially county party chairs who are overwhelmingly white and male, first decide who they want to run for office. Then they provide the county line, which affords those preferred candidates by the record showing an insurmountable 38-point advantage. I've got to stop you again, because it sounds like you're trying to make this into a racial or a gender thing, and I thought we'd just gotten past that. This is not about race or gender. This is about party organization, right? Because there's nothing in the record to suggest there's racial or gender discrimination going on here, is there? So, Your Honor, if you look at the Plaintiff's Verified Complaint, paragraph 175, footnote 27, and also in Exhibit F, there's lots of evidence about the way in which, yes, there's a substantial burden that's visited by the county line upon all voters. But it's also true, just a function of the way the race works, particularly in New Jersey, that this burden is disproportionately felt by voters of color, by new citizen voters. Did the district court say anything about that in its opinion? So the district court's focus was principally on the plaintiffs, which are candidates. Okay. And the district court found there's a substantial burden on their rights. There's an extension of that burden on voters more broadly. Okay. So, now, if you would... And it may be that it would be perfectly reasonable for you to say, you know, that's been addressed, we don't have something to add to it. But if you've got something to add to the argument about how we should weigh the Anderson-Burdick factors, how we should look at that, when the Democratic Committee of Camden County is saying, our associational rights are at stake here, too, and the change imposed by the district court is wrecking that, and that's not right. We're entitled to defend that, and on balance, the district court's finding that there was, like, 11.2% or 11.3% differential, it's just not severe, and the district court got out of its lane when it said change the ballot and imposed a mandatory preliminary injunction. But to the point, your point, Your Honor, about the evidence, so there was this evidence in the record that shows the county line provides, on average, a 38-point advantage to the preferred candidates of the parties,  for the preferred candidates. All of this happens before voters cast the ballot. And so New Jersey is the rare state where voters' votes are essentially beside the point because the results of an election are largely decided by county parties and county party leadership, who, again, are overwhelmingly white and male. That matters, Your Honor, because it speaks to the way in which, if you look at the makeup of the state legislature, New Jersey is a state, by the 2020 Census, that shows that people of color will soon be a majority, but 70% of those who serve in the state legislature are white. New Jersey is a majority of women, but just 37% of women serve in the state legislature. So it's true that there's a substantial burden on all voters, as the district court found. It's also true that people of color and women experience that burden disproportionately. Let me say... And why doesn't that 38% simply reflect the will of the voters? That is, if voters are going to come in and decide that this is the easy way to see all those who have been endorsed by the county committee, I'm comfortable with that. That endorsement, to me, gives them my stamp of approval, too. And so they go with it. Why is that a burden on voters? Because, Judge Crouch, the line is not a neutral thing. It's designed to have the effect of manipulating voters, and it does. Isn't it designed to communicate that those candidates have been endorsed by the committee? They have been endorsed. That endorsement is sort of a fait accompli, though, Your Honor. That endorsement essentially means that whomever they choose will win the election. So, for example, the evidence shows that with the advantage, the 38-point advantage, no incumbent legislator, which, again, tend to be white and male, has lost a primary election in the last 50 years. The reason that the interveners are fighting so hard to preserve this thing is because it has worked very well for parties over time. It's significant that not a single county is still in this case. And part of what I think we're seeing, and this is not hyperbolic, is there is a last sort of thrust to hold onto a machinery that has advantaged county parties and county party chairs, to your point, Judge Jordan, which, again, it's important to underscore, they tend to be overwhelmingly white and male as a way to control the state legislature and the legislative body. And ours is a state where voters have not had a voice at the ballot box for as long as a county line has been in effect. There's lots of evidence in the record about the... Let me ask if we've got, because... Do you have any questions? Do you have any questions? Okay. Thank you, Your Honor. Appreciate your argument, Mr. Haygood. We have three minutes for Mr. Tambusi for rebuttal. Thank you, Your Honor. I'll try to be brief because I appreciate the time you gave me, as hard as it was at the beginning of the argument. Judge, I think that there's two points I want to make. The one I want to first address is the Attorney General's letter. He's not an elected official, he's an appointed official, number one. And number two, he had the right to come into this litigation as he did in the other litigation, but he did not. He simply sent a letter to the court. Well, help me with that, because that's why I'm asking both of you about this. Is the decision not to intervene something that should make us go, well, you just don't care about that? Or is the decision not to intervene with an explanation why he's not intervening significant? Because in explaining why he's not intervening, the Attorney General says there's not a basis. The state does not have a legitimate basis to defend these statutes because they are unconstitutional. In my judgment, and thank you for correcting me, my judgment as the constitutional officer, I guess, for the state of New Jersey responsible for defending these things, I can't defend this. And that's why I'm not intervening. Does that mean because he didn't intervene that all the things he said should be ignored? His intervention, the fact that he didn't intervene, Judge, and in his letter weighed the evidence before the court did, weighed the evidence without hearing any of the evidence, before the court did, equated his letter to no more than somebody that was passing by. Because he did not. He did not. He had the opportunity to step into the case because the Secretary of State was a party to the case. He had the opportunity to do that, and he did not. But see, given who he is, and given that the county clerks here have opted not to pursue the appeals, at a minimum, doesn't that go to the questions of federalism and comedy? That I take it you were raising in your brief by pointing us to the New Jersey state cases. It does, Your Honor. But I think that the way you have to look at this is the way that the Attorney General chose to go about this, and the context in which he went about it. You raised the point about the county clerks not being here. The county clerks have a statutory obligation to run an election, and a fair election. And the county clerks were faced with an order from Judge Karashi. They can disagree with the order, and they can continue to disagree with the order, but they still have to comply with the order. And coming here on an emergent basis, using state taxpayer funds to do so, could have played into their decision-making process. So I'm not going to... So you're saying it could reasonably be viewed as a purely practical decision? Absolutely, Judge. And we shouldn't be penalized. Our assertion of our associational rights shouldn't be penalized because they made a practical decision. Okay. So limit my question then to the Attorney General. Doesn't the Attorney General's decision not only not to intervene, but to have analyzed the statute, and on behalf of the state of New Jersey, to decline to enforce it, decline to defend it, shouldn't that, at least as a matter of federalism and comity, give us reassurance that those interests are not in play here? As an officer of the court, the Attorney General has the obligation, if he wanted to make a statement that is to be considered in this litigation, to be considered with great weight, that it be pursued in the matter in accordance with the court rules. He didn't do that. Do you think that... If he had intervened and said exactly the same thing, then we could consider it because he didn't intervene, we can't? If he intervened. If he had intervened in the case. Or had an appearance as a matter of... Intervened and said exactly the same thing. It's the lack of intervention that you're saying matters. I think it does matter, Judge. If he had not intervened, but he had said, I want to submit this as an amicus statement. Well, he would have intervened. He would have been in the case. He submitted an amicus statement. He would have been a party to the case. They're not parties. They're just... They ask for permission to be heard and they submit something. So that doesn't make them an intervener or a party. It just makes them somebody that we say, okay, we will hear from you, Mr. Murata. We'll hear from you, Mr. Haywood. We'll hear from you. So if he hadn't intervened, but he just submitted it as an amicus, would that be okay? If, in fact, he submitted it in accordance with the rules, and if, in fact, that which he said is worthy of consideration under the circumstances in which he submitted it. I mean, you have a situation where the Attorney General weighed the evidence. Yeah, we got that. Do you dispute the authenticity of the letter? I do not. Under New Jersey law, is the Attorney General permitted to intervene and not support or argue in support of the validity of a New Jersey statute? I think at that point in time, Judge Freeman, the Attorney General has to comply with the rules. And the Attorney General, if the Attorney General does not have a belief grounded in reason, grounded in facts, grounded in the evidence to uphold or defend the constitutionality of New Jersey statutes, has an obligation to say so. Well, he did say so. That's the whole point. That's what we're dealing with. In the criminal context, we have cases called Anders cases where a party represented by a lawyer will sometimes find him or herself seeing a brief from that lawyer saying, I need to withdraw because I cannot defend. I have no basis. On which to argue further on behalf of this client. There's no sound legal reason that I can think of. And so you should let me out of the case. Why isn't this akin to an Anders brief, so to speak, by the New Jersey Attorney General who comes in and says, you don't have to let me out of the case because I'm not in. But I can't even in good faith ask to be brought into the case because I have nothing to say to defend these statutes. On the contrary, these statutes are unconstitutional. Now, we don't take an Anders brief and say, well, we're not going to pay attention to you if all you want to do is get out of the case. We listen to what the lawyer has to say. Why shouldn't we listen to what the New Jersey Attorney General has to say? What the record is in this case is the district court said, I'm not going to listen to what the Attorney General said. I'm not going to listen. I'm not going to consider it. I'm not going to consider it in the context in which it was sent and when it was sent. So it seems quite unusual, the path that the Attorney General took in this case. And so my initial question to you was, is he authorized by statute to intervene, to do anything other than to defend the statute? So I'm not sure if I know the answer to that question yet. But the other things that we see in other contexts are sometimes when federal statutes are at issue, the United States government will file a statement of interest about its interpretation of the statute. So it seems that this sort of letter saying, I'm not intervening, but let me tell you my opinion anyway, is quite unorthodox, or at least unusual. So I'd be interested if either side had anything further to say about why that happened. And I guess your position is simply, he's not formally in the case, didn't file any more traditional documents, therefore you should not consider the content of his letter. I think you should consider it in the context of the record, which was that the district court didn't consider it at all. But the district court, having received a third-party letter, that is someone who's not a party to the case, opted nonetheless to have it docketed to be part of the record. And the district court could have simply rejected it as a filing by a non-party, right? I can't speak for Judge Karashi in that regard, Judge Krause, because I don't know what his reasoning was as to why he wanted to put it on a docket. It could be perhaps that he simply wanted to put it on the docket to substantiate his feelings or statements at that time of outrage. Whether the district court relied on it or considered it, so long as it's part of the record, what prevents us from considering it? I think it wasn't considered below, and it has to be looked at from that perspective, Judge. We've got a lot of cases that say, we can affirm or we can reverse on it. Well, it's affirm. We can affirm on any basis supported by the record. That's the language repeatedly in our cases, right? It is, Judge. Okay. My last point, Judge, was plaintiffs in this case, the issue of severity should not be, severity of a burden on associational rights are not measured by the effect it has on the election. Plaintiffs have the same rights to get on the ballot, to carry the weight of the line. We got you. Thank you. I appreciate it. I hope everybody feels like this has been thoroughly vetted. We appreciate your argument. We appreciate the argument from the appellees. We're grateful to Mr. Mench, Mr. Marotta, Mr. Haygood, who came and took their time to speak on behalf of the meekie. We've got the matter under advisement, and we recognize the importance of timing, and we will get back to you promptly. Thank you. We're in recess.